UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -:

KEVIN CARR,                        :     16 Civ. 5877 (VSB)(JCF)
                                   :
                Plaintiff,         :        REPORT AND
                                   :        RECOMMENDATION
   - against -                     :
                                   :
COMMISSIONER OF SOCIAL SECURITY,   :

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/11/17

                Defendant.         :

- - - - - - - - - - - - - - - - -:

TO THE HONORABLE VERNON S. BRODERICK, U.S.D.J.:

The plaintiff, Kevin Carr, brings this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of a determination of the Commissioner of Social Security (the "Commissioner") finding that he is not entitled to Supplemental Security Income ("SSI") or disability insurance benefits ("DIB"). The parties have submitted cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, I recommend that the plaintiff's motion be granted, the Commissioner's motion be denied, and the case be remanded to the Social Security Administration for further administrative proceedings.

Background

A. Personal and Vocational History

The plaintiff was born on September 13, 1958, and completed high school. (Administrative Record ("R.") at 185, 215). He

1

worked as a meat packer from April 2004 until June 2011. (R. at 216). For a few months at the end of 2012, he worked as a construction worker. (R. at 216). Mr. Carr was fifty-four years old when he filed an application for DIB on April 8, 2013, and an application for SSI on May 2, 2013. (R. at 183-200). In his DIB application, he claimed he became unable to work on June 1, 2011 (R. at 185); in his SSI application he claimed a disability onset date of January 1, 2013 (R. at 192). Mr. Carr asserted that the following conditions limited his ability to work: bipolar disorder, anxiety, depression, asthma, high blood pressure, back pain, gastroesophageal reflux disease ("GERD"), and marcoglobulinemia.[1] (R. at 214). At the time of his applications, Mr. Carr was divorced and living in a shelter. (R. at 192, 224).

He completed a Function Report in connection with his application for benefits on May 20, 2013. (R. at 224-32). He asserted that medications interfered with his sleep and that he could "sometimes" dress himself and shave. (R. at 225-26). He was able to bathe, feed himself, shop for food, and use the toilet. (R. at 225-26, 228). He reported leaving the shelter in which he lived each day to walk to his appointments (including monthly

---

[1] Macroglobulinemia is a kind of non-Hodgkin lymphoma. Waldenström Macroglobulinemia, Lymphoma Research Foundation, http:www.lymphoma.org/site/pp.asp?c=bkLTKaOQLmK8E&b=6300163 (last visited May 8, 2017).

appointments with health care providers and weekly visits to food pantries), but stated that panic attacks kept him from "go[ing] places or on trains." (R. at 227-29). He could not lift things, walk "too far," stand or sit "too long," kneel, squat, or climb stairs because of his back pain and his asthma. (R. at 229-30). When he walked, he could travel for two blocks and then required a thirty-minute rest. (R. at 231). He also reported problems paying attention and remembering things. (R. at 231-32).

B. Medical Evidence

1. Physical Impairments

Mr. Carr began seeking monthly treatment for low back pain at La Casa de Salud in June 2012, which continued at least until October 2014. (R. at 449). He had a physical therapy evaluation on December 17, 2012, at All Med Medical and Rehabilitation Center. (R. at 324-26).[2] He rated his lower back pain at an eight on a scale of one to ten. (R. at 325). His lumbosacral spine had a range of motion of ninety degrees flexion and twenty degrees extension. (R. at 325). He had numbness in both thighs and some spasms. (R. at 325). His endurance was poor, his standing balance and ambulation were fair, and his seated balance was good. (R. at 325). On a straight leg raise test, he complained of pain or tightness on the right side at thirty degrees. (R. at 325).

[2] This document is largely illegible.

It appears that he returned for physical therapy four times within the next few weeks and reported reduced pain and tenderness. (R. at 322-23).

Dr. Marilee Mescon conducted a consultative medical examination on June 17, 2013. (R. at 342). Mr. Carr claimed a history of GERD and of cocaine and heroin use. (R. at 342). He described a back injury that occurred while lifting weights, and back pain of between seven and nine on a scale of one to ten. (R. at 344). He asserted that he could cook, clean, do laundry, shop, shower, bathe, and dress. (R. at 342). His blood pressure was 140/80. (R. at 342). Mr. Carr's gait and stance were normal; he could walk on heels and toes, as well as squat. (R. at 342). Although he used a cane, it was not necessary for ambulation. (R. at 342). His skin, lymph nodes, head, face, eyes, ears, nose, throat, neck, chest, lungs, and heart were normal, but there was a reducible umbilical hernia in the abdomen. (R. at 343). Mr. Carr had full ranges of motion in his lumbar and cervical spine. (R. at 343). Supine active straight leg raise test was zero to forty degrees; seated was zero to ninety degrees. (R. at 343). There were limitations in his hip rotation. (R. at 343). Dr. Mescon found no limitations in Mr. Carr's ability to sit, stand, climb, push, pull, or carry. (R. at 345). She recommended that he avoid environmental contaminants because of a history of asthma,

and have his blood pressure reassessed by his physician. (R. at 345).

On July 17, 2013, Mr. Carr saw Jon Sepinski, a physician assistant, complaining of lower back pain that was aggravated by bending and lifting, and alleviated by injections, pain medications, and physical therapy.[3] (R. at 452). Mr. Sepinski recorded lumbar spasm and paraspinal tenderness. (R. at 453). Pain relieving medications, including a topical cream, were prescribed. (R. at 453). Mr. Carr returned for a visit on August 14, 2013, complaining of intermittent lower back pain of moderate to severe intensity, which was aggravated by "daily activities," bending, lifting, sitting, and standing, and, as before, alleviated by injections, medication, and therapy. (R. at 450). Again, Mr. Sepinski recorded a lumbar spasm and paraspinal tenderness, and, again, pain relieving medications were prescribed. (R. at 450). Mr. Carr stopped receiving cortisone injections in September 2013, because the pain management provider at La Casa de Salud left. (R. at 449).

On July 17, 2014, Dr. Cindy Grubin performed a physical examination of Mr. Carr for a social services organization known as FEGS. (R. at 397-417). She noted episodic sharp lower back

---

[3] It appears that Mr. Carr had also visited the provider on July 16, 2013. (R. at 452).

pain of moderate severity, but found no exertional, respirational, or environmental limitations. (R. at 409-12).

Nurse Practitioner Carline Lamour Ocean filled out a Medical Source Statement on September 29, 2014. (R. at 441-47). She noted that Mr. Carr had attended monthly thirty-minute appointments geared to managing his chronic lower back pain. (R. at 441). In addition to lower back pain, she diagnosed bulging discs at L4/L5 and L5/S1, and she noted resulting tenderness and reduced range of motion in his lower back. (R. at 441). Nurse Practitioner Ocean opined that Mr. Carr's pain often interfered with his attention and concentration and that he was moderately limited in his ability to deal with stress. (R. at 442). She assessed him as being able to sit up to fifteen minutes at a time with a fifteen minute interval of standing and walking about, but he could not sit for more than one hour in an eight-hour day. (R. at 442-43). Mr. Carr could stand or walk about for thirty minutes at a time with a thirty minute break to recline or lie down, but he could not stand or walk about for more than one hour in an eight-hour day. (R. at 443-44). In addition, in an eight-hour day, Mr. Carr's pain would necessitate rest in addition to normal rest and meal breaks. (R. at 444). His ability to lift and carry one to five pounds was unrestricted, as was his fingering ability. (R. at 445-46). He could frequently lift and carry six to ten

pounds, balance, engage in forward and backward flexion of the neck, and rotate his neck to the right and to the left. (R. at 445-46). He could occasionally lift eleven to twenty pounds, stoop, reach, and handle. (R. at 444-45). He could never lift twenty-one to fifty pounds. (R. at 444). The nurse practitioner estimated that Mr. Carr's condition would result in his absence from work more than three times per month. (R. at 447). His condition had persisted since October 2013. (R. at 447).

## 2. Psychiatric Impairments

In January 2013, FEGS evaluated Mr. Carr in connection with his public assistance case. (R. at 384; Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Def. Memo.") at 6 & n.4). Mr. Carr reported anxiety and a history of drug use and hearing voices. (R. at 385, 397). He also stated that he had been receiving psychiatric treatment from Dr. Carl St.-Preux at La Casa de Salud. (R. at 397).

The first medical record from Dr. St.-Preux is a Wellness Plan Report dated February 12, 2013.[4] (R. at 432-33). It appears

_____

[4] The document contains a notation -- "3 months" -- which might indicate the number of months he had been receiving treatment from Dr. St.-Preux, especially as (1) he began receiving treatment from the psychiatrist prior to January 2013 (R. at 397), and (2) in April 2013, Dr. St.-Preux estimated that Mr. Carr's then-current symptoms had lasted for the past six months -- that is, from approximately three months prior to the February appointment (R.

to reflect two diagnoses: the first is anxiety disorder and the second is illegible. (R. at 432). Dr. St.-Preux found Mr. Carr alert, cooperative, oriented, well-groomed, coherent, of neutral mood, and displaying good judgment. (R. at 432). He reported no delusions or suicidal or homicidal ideation. (R. at 432). Dr. St.-Preux listed Mr. Carr's medications as Klonopin, Paxil, and Ambien. (R. at 432). He opined that Mr. Carr's condition made him unable to work for at least twelve months. (R. at 433).

On April 16, 2013, Dr. St.-Preux completed a psychiatric and psychosocial impairment questionnaire after examining Mr. Carr. (R. at 328-35). He diagnosed "Bipolar disorder Manic/Panic disorder" and assigned a GAF score of seventy.[5] (R. at 328). He

_____

at 335).

[5] The GAF is a psychiatric assessment tool that generates a numerical representation of a clinician's judgment as to a patient's overall functioning along a continuum of mental health. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM-V"). The GAF was dropped from DSM-V "for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice." DSM-V 16. The GAF Scale provides scores from one ("[p]ersistent danger of severely hurting self or others") to one hundred ("[s]uperior functioning in a wide range of activities"). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) ("DSM-IV"). Scores eighty-one to one hundred indicate minimal or no symptoms; the seventy-one to eighty range is for patients responding appropriately to stress; patients within the sixty-one to seventy bracket have mild symptoms or some difficulty in social or occupational settings but generally function well; patients with a GAF between fifty-one and sixty are described as having moderate symptoms, or moderate difficulty in social or

identified a number of symptoms from a checklist: poor memory, appetite disturbance with weight change, perceptual disturbances, sleep disturbance, personality change, mood disturbance, emotional lability, delusions or hallucinations, manic syndrome, recurrent panic attacks, psychomotor agitation or retardation, persistent irrational fears, paranoia or inappropriate suspiciousness, generalized persistent anxiety, feelings of guilt or worthlessness, difficulty thinking or concentrating, hostility and irritability, and suicidal ideation or attempts. (R. at 329). The primary symptoms were depressed mood, anxiety, paranoia, elation, labile affect, hallucinations, and delusions. (R. at 330). The most frequent were panic attacks, hallucinations, and paranoia. (R. at 330).

According to Dr. St.-Preux, Mr. Carr was markedly limited in all areas of understanding and memory; all areas of sustained concentration and persistence; most areas of social interaction (he was moderately limited in the ability to ask simple questions or request assistance and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness); and most areas of adaptation (he was moderately limited in the ability to travel to unfamiliar places or use public

---

occupational functioning; a GAF score of forty-one to fifty indicates "[s]erious symptoms . . . [or] any serious impairment in social, occupational, or school functioning." DSM-IV 34.

transportation). (R. at 331-33). Dr. St.-Preux also opined that Mr. Carr experienced episodes of deterioration or decompensation which would exacerbate his symptoms or cause him to withdraw from work situations. (R. at 333). Mr. Carr treated his symptoms (which were expected to last at least twelve months) with Seroquel, Paxil, Klonopin, and Ambien. (R. at 333-34).

Finally, Dr. St.-Preux wrote that Mr. Carr's anxiety and panic disorder exacerbated his lower back pain, that he was unable to work because of his "severe psychiatric condition," and that his condition would require him to be absent from work more than three times per month.[6] (R. at 334-35).

Psychologist David Mahony performed a consultative psychiatric evaluation on June 17, 2013. (R. at 350-53). Mr. Carr reported symptoms of depression including depressed mood, hopelessness, irritability, social withdrawal, and a history of suicidal ideation, but he "was unable to clarify any symptoms of mania, indicating he does not have bipolar disorder." (R. at 350). He also reported feeling scared and hearing voices telling him to "hurt somebody." (R. at 350-51). Dr. Mahony noted "cognitive defects secondary to his psychiatric symptoms, including short-term memory deficits, difficulty learning new

---

[6] Mr. Carr apparently visited Dr. St.-Preux again on May 23, 2013 (R. at 376), but there is no record of that visit or any follow-up visits until August 20, 2013 (R. at 381).

material, and executive functioning deficits." (R. at 351). Upon examination, Dr. Mahony found Mr. Carr acceptably groomed, with appropriate eye contact and normal posture and motor behavior. (R. at 351). Speech and thought processes were normal, but he had a depressed affect, dysthymic mood, and "mildly impaired" sensorium. (R. at 351-52). He was not fully oriented. (R. at 352). His attention and concentration were impaired, as were his recent and remote memory skills. (R. at 352). His cognitive functioning was below average, with a limited general fund of information, and his insight was poor. (R. at 352). His judgment was appropriate. (R. at 352).

Dr. Mahony found that Mr. Carr could follow simple directions, perform simple tasks independently, maintain attention and concentration, and maintain a regular schedule. (R. at 352). There were mild limitations in his ability to relate to others and deal with stress. (R. at 352). He had marked limitations learning new tasks, performing complex tasks, and making appropriate decisions. (R. at 352). Dr. Mahony asserted that Mr. Carr's symptoms would interfere with his ability to function on a daily basis. (R. at 353). He diagnosed moderate major depressive disorder of atypical type, and he also stated, "Rule out substance induced, persisting dementia." (R. at 353). He noted that Mr. Carr's substance abuse status was "current[ly] [] unknown." (R.

at 353). Dr. Mahony recommended continued psychiatric treatment, a neurological exam, and confirmation of his substance abuse status. (R. at 353). He found Mr. Carr's prognosis "poor" noting "severe cognitive deficits" that made it difficult for him to function and prevented him from managing his own funds. (R. at 353).

Dr. St.-Preux prepared a psychosocial evaluation on August 20, 2013. (R. at 381). Mr. Carr was appropriately dressed and groomed, with normal motor activity, normal speech and thought content, and good insight and judgment. (R. at 382-83). His affect and mood were "congruent to situations," and he was fully oriented and cooperative. (R. at 382-83). There was "some circumstantialities and tangentiality" to his thought form. (R. at 382). Dr. St.-Preux diagnosed bipolar disorder and assigned a GAF of sixty-five, noting it was the "[h]ighest [l]evel in [the] [p]ast year." (R. at 383). He "deemed [Mr. Carr] appropriate for independent living." (R. at 383).

On March 20, 2014, FEGS noted that Mr. Carr's treating physician reported that Mr. Carr had a substantial mental disability and could not work for twelve months. (R. at 397).

Mr. Carr visited Dr. St.-Preux on May 19, 2014. (R. at 376). The plaintiff presented with anxious and fearful thoughts, depressed mood, excessive worry, hallucinations, and paranoia.

(R. at 376). He had a decreased need for sleep, difficulty falling and staying asleep, and fatigue. (R. at 376). Dr. St.-Preux noted Mr. Carr's history of drug abuse and of suicidal and homicidal thoughts. (R. at 377). Mr. Carr's behavior, psychomotor skills, memory, sensorium, intellect, attitude, attention, reasoning, impulse control, judgment, insight, and self-perception were within normal tolerances. (R. at 380). However, Dr. St.-Preux described Mr. Carr's speech as pressured, his affect as labile and expansive, his mood as labile and anxious, and his thought processes as "show[ing] flight of ideas." (R. at 380). He also noted auditory hallucinations, delusions, and paranoia. (R. at 380). He diagnosed the plaintiff with "[b]ipolar 1 disorder," opiate dependence (continuous), and panic disorder, and assigned a GAF of sixty-five. (R. at 380). Dr. St.-Preux prescribed Seroquel and Klonopin and discontinued Ambien and Paxil. (R. at 380).

On July 17, 2014, Dr. Grubin performed a psychological examination along with a physical examination. (R. at 409). She found that the plaintiff had difficulty concentrating and tolerating stress and crowds. (R. at 411). She suggested a low stress work environment. (R. at 412). She further diagnosed unstable bipolar disorder and panic disorder without agoraphobia, and found that both conditions impacted employment. (R. at 415).

13

According to Dr. Grubin, the plaintiff's mental health disorder prohibited gainful employment. (R. at 417). There were similar diagnoses and findings on July 20, 2014. (R. at 420-22).

Dr. St.-Preux completed a Medical Source Statement on September 25, 2014. (R. at 434, 439). Mr. Carr presented with fearful thoughts, decreased need for sleep, depressed mood, difficulty falling and staying asleep, hallucinations, and paranoia. (R. at 436). His medications were Seroquel, Klonopin, Ambien, and Paxil. (R. at 436).

The statement consisted, in part, of a checklist of symptoms.[7] (R. at 435). Dr. St.-Preux found that Mr. Carr experienced the following symptoms with severe intensity: poor memory, sleep disturbance, recurrent panic attacks, difficulty thinking or concentrating, and manic syndrome. (R. at 435). The following symptoms were of moderate intensity: personality change, mood disturbance, emotional lability, substance dependence, anhedonia or pervasive loss of interest, feelings of guilt or worthlessness, social withdrawal or isolation, decreased energy, intrusive recollections of a traumatic experience, somatization unexplained by organic disturbance, and pathological dependence or passivity. (R. at 435). Finally, Mr. Carr had the following mild symptoms:

---

[7] Dr. St.-Preux marked each applicable symptom with one, two, or three checkmarks. (R. at 435). I infer that the number of check marks indicates the severity of the symptom.

14

appetite disturbance with weight change, paranoia or inappropriate suspiciousness, suicidal ideation or attempts, time or place disorientation, generalized persistent anxiety, and hostility and irritability. (R. at 435). Dr. St.-Preux found that Mr. Carr had marked or extreme loss of functionality in all areas related to understanding, remembering, and carrying out instructions, as well as all areas related to the ability to respond appropriately to supervision, coworkers, and work pressure in a work environment. (R. at 437-38).

Dr. St.-Preux assessed slight restriction in Mr. Carr's activities of daily living; marked difficulties in maintaining social functioning; constant deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and continual episodes of deterioration or decompensation in work or work-like settings. (R. at 438-39). He opined that these restrictions had lasted since the 1980s. (R. at 439).

C.   Procedural History

As noted above, Mr. Carr filed an application for DIB on April 8, 2013 (claiming a disability onset date of June 1, 2011) and an application for SSI on May 2, 2013 (claiming a disability onset dated of January 1, 2013), asserting that he was afflicted with bipolar disorder, anxiety, depression, asthma, high blood

pressure, back pain, GERD, and marcoglobulinemia. (R. at 185, 192, 214).

Mr. Carr's applications were denied initially on September 5, 2013, after which Mr. Carr requested a hearing before an Administrative Law Judge ("ALJ"). (R. at 121-30). ALJ Wallace Feuer presided over the hearing on October 22, 2014, during which Mr. Carr was represented by counsel. (R. at 32-94). The plaintiff described his back pain as a stiffness in the lower middle of his back, which was relieved with medication -- specifically, Percocet. (R. at 62). The pain limited his ability to walk to approximately one-half of a block at a time. (R. at 76-77).

Mr. Carr reported taking Klonopin and Paxil for depression, Ambien to help him sleep, and an inhaler for asthma. (R. at 63-64). Mr. Carr asserted that his psychiatric medication "really help[ed]" with panic attacks, and that he only felt "nervous [when he was] on a train with a lot of people." (R. at 69). The medication also alleviated auditory hallucinations telling him "to do bad things" so that he had them approximately twice per week only, and visual hallucinations which he had only once per week. (R. at 71-72). The plaintiff also described trouble concentrating and memory problems. (R at 78-79).

The ALJ issued a decision on April 3, 2015, finding that the plaintiff was not disabled under the Act. (R. at 14). The Appeals

Council denied review on June 23, 2016.  (R. at 1).

D.  Development of the Record

The Commissioner requested information from La Casa de Salud, which, on the second request, provided certain records.  (R. at 364).  At the hearing before ALJ Feuer, plaintiff's counsel stated that he wanted to submit additional treatment notes from Nurse Practitioner Ocean and her supervising physician.  (R. at 37). The ALJ noted that the treatment notes from Dr. St.-Preux in the record were limited, and he asked counsel to procure any additional notes.  (R. at 38).  Finally, the ALJ asked counsel to secure additional records from Mr. Carr's physical therapist and from the health care provider who gave him back injections.  (R. at 86-88). In January 2015, approximately two and one-half months after the hearing, ALJ Feuer wrote to plaintiff's counsel noting that counsel had not provided any additional records and granting an additional ten days to submit evidence or request an extension.  (R. at 312). There was no response.  (Def. Memo. at 13).

Analytical Framework

A.  Determination of Disability

A claimant is disabled under the Social Security Act and therefore entitled to disability benefits if he can demonstrate, through medical evidence, that he is unable to "engage in any substantial gainful activity by reason of any medically

17

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); accord 42 U.S.C. § 1382c(a)(3)(A); Arzu v. Colvin, No. 14 Civ. 2260, 2015 WL 1475136, at *7 (S.D.N.Y. April 1, 2015). The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is entitled to disability benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the claimant must demonstrate that he is not currently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), (b), 416.920(a)(4)(i), (b). Second, the claimant must prove that he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). Third, if the impairment is listed in what are known as "the Listings," see 20 C.F.R. Part 404, Subpt. P, App. 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d),

416.920(a)(4)(iii), (d).   Fourth, if the claimant is unable to make the requisite showing under step three, he must prove that he does not have the residual functional capacity to perform his past work.   20 C.F.R. §§ 404.1520(a)(4)(iv), (e), 416.920(a)(4)(iv), (e).   Fifth, if the claimant satisfies his burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g), 416.960(c); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).   In order to determine whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience.   Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

B.   Judicial Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law.   See Burnette v. Carothers, 192 F.3d

52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Social Security Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence." Geertgens v. Colvin, No. 13 Civ. 5133, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); see also Longbardi, 2009 WL 50140, at *21.

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. Tejada, 167 F.3d at 773; Calvello, 2008 WL 4452359, at *8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140, at *21 (citing Brown, 174 F.3d

at 62, and Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)).

Substantial evidence in this context is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

Analysis

A.   The ALJ's Decision

ALJ Feuer analyzed the plaintiff's claim pursuant to the five-step sequential evaluation process and concluded that he was not disabled on or after his claimed disability onset dated of January 1, 2013.  (R. at 19-26).  He first found that Mr. Carr met the insured status requirement of the Act through December 31, 2017. (R. at 19).  He then determined that the plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. at 19).  At step two, the ALJ found that Mr. Carr had impairments -- lower back pain and bipolar disorder -- that caused more than minimal limitation on his ability to perform basic work activities. (R. at 19).  He also noted that Mr. Carr's asthma and high blood pressure were not severe impairments within the meaning of the Act.  (R. at 19-20).

At step three, the ALJ found that neither of the plaintiff's impairments, either individually or in combination, met or was the

equivalent in severity of the relevant impairments described in Listing 1.04 (disorders of the spine) or Listing 12.04 (affective disorders). (R. at 20); see 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 1.04, 12.04. Addressing Listing 12.04, the ALJ determined that the plaintiff did not have at least two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (R. at 20-21). Rather, he found that the plaintiff's limitations were, at worst, "moderate." (R. at 20-21). He also found that the medical evidence did not indicate (1) that Mr. Carr's mental impairments resulted in repeated episodes of decompensation, (2) a residual disease process resulting in marginal adjustment, or (3) a history of inability to function outside of a highly supportive living arrangement. (R. at 21); see 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04(c).

Next, ALJ Feuer determined that Mr. Carr had the residual functional capacity to perform medium work with the following limitations: he could only occasionally climb ramps and stairs, kneel, crouch, and crawl; he had to avoid concentrated exposure to dust and other pulmonary irritants; he would be limited in his

exposure to co-workers, supervisors, and the public; and he could perform only simple, routine, and repetitive tasks. (R. at 21).

Regarding Mr. Carr's physical limitations, the ALJ noted that the physical therapy he received in December 2012 and January 2013 appeared to alleviate his back pain and tenderness. (R. at 22). In July 2013, the plaintiff had lumbar spasm and paraspinal tenderness but a negative straight leg raising test and no restrictions on flexion, extension, or lateral bending or rotation; normal lower extremity strength; and no hip pain, crepitus, tenderness, instability, swelling, or effusion. (R. at 22). Moreover, he reported improvement with medication and therapy. (R. at 22). An examination in August 2013 was "essentially unchanged." (R. at 22). The ALJ noted that although a letter from an administrator at La Casa de Salud indicated that Mr. Carr received monthly pain treatments, there were no medical records to support this other than those mentioned. (R. at 22). The ALJ gave some weight to the opinion of consultative examiner Dr. Mescon, noting that her assessment that Mr. Carr had no limitations in his ability to sit, stand, push, pull, or carry heavy objects and that her recommendation that he avoid pulmonary irritants was "generally consistent with her examination findings and the very limited treating source record." (R. at 23). He gave little weight to Nurse Practitioner Ocean's medical source

statement form from September 2014, which assessed significant limitations in Mr. Carr's ability to stand and walk or sit during an eight-hour workday, and opined that he would frequently miss work. (R. at 25).

As for Mr. Carr's psychiatric limitations, the ALJ gave little weight to Dr. St.-Preux's opinion from February 2013 that Mr. Carr was unable to work for at least twelve months, as well as his assessment from April 2013 that the plaintiff had marked limitations in almost all areas of mental functioning; he also gave little weight to Dr. St.Preux's similar conclusions from September 2014. (R. at 24). The ALJ found these opinions inconsistent with "largely normal examination findings in August 2013" and with GAF scores of seventy and sixty-five in April and August 2013. (R. at 24). In addition, he gave little weight to Dr. Grubin's July 2014 assessment that the plaintiff's mental limitations prohibited him from gainful employment, finding it unsupported by examination findings. (R. at 25-26). The ALJ gave some weight to consultative examiner Dr. Mahony, who found no limitations in Mr. Carr's ability to follow and understand simple directions, perform simple tasks independently, maintain attention and concentration on such tasks, and maintain a regular schedule. (R. at 23-24). The ALJ found these conclusions consistent with examination findings and with Dr. Mahony's assigned GAF score of

sixty-five.  (R. at 23-24).  Similarly, ALJ Feuer gave some weight
to non-examining consultant E. Kamin who in September 2013 found
that the plaintiff had mild limitations in daily living activities
and social functioning, and moderate limitations in maintaining
concentration, persistence, or pace.  (R. at 24).

At step five, relying on the testimony of a vocational expert,
the ALJ found that a person of Mr. Carr's age, education, work
experience, and residual functional capacity would be able to
perform his past relevant work as a meat packer, even with the
additional restriction that limited him to performing simple,
repetitive tasks.  (R. at 26).  Therefore, ALJ Feuer found that
Mr. Carr was not disabled.

B.   Duty to Develop the Record

"Before determining whether the Commissioner's conclusions
are supported by substantial evidence," a court "must first be
satisfied that the claimant has had a full hearing under the
. . . regulations and in accordance with the beneficent purposes
of the [Social Security] Act."  Moran v. Astrue, 569 F.3d 108, 112
(2d Cir. 2009) (alterations in original) (quoting Cruz v. Sullivan,
912 F.2d 8, 11 (2d Cir. 1990)).  "Even when a claimant is
represented by counsel, it is the well-established rule in [the
Second] [C]ircuit 'that the social security ALJ, unlike a judge in
a trial, must on behalf of all claimants . . . affirmatively

25

develop the record in light of the essentially non-adversarial nature of a benefits proceeding.'" _Id._ (third alteration in original) (quoting _Lamay v. Commissioner of Social Security_, 562 F.3d 503, 508–09 (2d Cir. 2009)); _see also_ _Perez v. Chater_, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.").

Generally, "if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information . . . to fill any clear gaps before rejecting the doctor's opinion." _Ureña-Perez v. Astrue_, No. 06 Civ. 2589, 2009 WL 1726217, at *29 (S.D.N.Y. Jan. 6, 2009), _report and recommendation adopted as modified_, 2009 WL 1726212 (S.D.N.Y. June 18, 2009). Where the gaps or inconsistencies concern a treating physician's opinions, and in particular those of a treating psychiatrist, this duty is especially crucial. _See, e.g._, _Craig v. Commissioner of Social Security_, __ F. Supp. 3d __, __, 2016 WL 6885216, at *13 (S.D.N.Y. 2016) ("The duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace." (quoting _Merriman v._

_Commissioner of Social Security_, No. 14 Civ. 3510, 2015 WL 5472934, at \*19 (S.D.N.Y. Sept. 16, 2015))); _Martinez v. Colvin_, No. 15 Civ. 1596, 2016 WL 3681426, at \*9 (S.D.N.Y. June 15, 2016) (noting that treating physician rule, which generally gives more weight to opinions of treating sources, "is even more relevant in the context of mental disabilities, which by their nature are best diagnosed over time" (quoting _Lopez-Tiru v. Astrue_, No. 09 CV 1638, 2011 WL 1748515, at \*4 (E.D.N.Y. May 5, 2011))). Thus, "failure to develop conflicting medical evidence from a treating physician is legal error requiring remand." _Concepcion v. Colvin_, No. 12 Civ. 6545, 2014 WL 1284900, at \*13 (S.D.N.Y. March 31, 2014) (quoting _Miller v. Barnhart_, No. 03 Civ. 2072, 2004 WL 2434972, at \*8 (S.D.N.Y. Nov. 1, 2004)).

Here, ALJ Feuer remarked on the dearth of treatment notes from Dr. St.-Preux, Mr. Carr's treating psychiatrist. (R. at 38). Indeed, the ALJ commented that he "need[ed] [those] treatment notes so that [he could] weigh whether there's a foundation for [Dr. St.-Preux's] opinions," such as "the [September 2014] medical source statement that was submitted from [Dr. St.-Preux]." (R. at 38). The ALJ was similarly aware of the absence of treatment notes from Nurse Practitioner Ocean or her supervising physician, as well as records of Mr. Carr's physical therapy. (R. at 37, 87-88, 93-94). That is borne out in the ALJ's opinion, which comments

27

on the "very limited" medical record.  (R. at 22-25).  Moreover,

ALJ Feuer gave little weight to Dr. St.-Preux's opinions in

February 2013, April 2013, and September 2014, because they were

inconsistent both with his August 2013 findings and with the GAF

scores assigned in April and August 2013.  (R. at 24).  That is,

the ALJ noted internal inconsistencies in the April 2013 record,

as well as inconsistencies between the August 2013 record and the

opinions of February 2013, April 2013, and September 2014.  He

also discounted Nurse Practitioner Ocean's September 2014 opinion

"because it is unsupported by treatment notes and broadly

inconsistent with the overall medical evidence of record."  (R.

at 25).  This, then, appears to be a situation in which the lack

of medical records was central to the ALJ's decision.

The Commissioner argues that "the ALJ attempted to fill th[e]

clear gap in the record before deciding the case" by asking Mr.

Carr's counsel at the hearing to obtain the records and later

"giving him another opportunity to provide the records" via the

January 2015 letter.  (Def. Memo. at 19).  But the ALJ has an

"affirmative" duty to develop the record that is "independent" of

the plaintiffs' duty to provide evidence.  See, e.g., Harris v.

Colvin, No. 11-CV-1497, 2013 WL 5278718, at *6, 8 (N.D.N.Y. Sept.

18, 2013).  Thus, courts in this Circuit have held that an ALJ

cannot rely on the plaintiff (or his counsel) to provide additional

medical records.  See, e.g., Corona v. Berryhill, No. 15 CV 7117,

2017 WL 1133341, at *16 (E.D.N.Y. March 24, 2017) ("The ALJ's

discussion on the record with Plaintiff's counsel regarding Dr.

Chaudhry's treatment notes and her decision to leave the record

open for thirty days for the submission of his records were not

sufficient to satisfy her duty because the ALJ took no further

action to ensure that the record was complete, even though the ALJ

was well aware that the record request had been outstanding since

September 24, 2014, over two months before the hearing." (citations

omitted) (footnote omitted)); Glast v. Astrue, No. 11 CV 5814,

2013 WL 5532696, at *10 (E.D.N.Y. Sept. 30, 2013) ("That the ALJ

requested information from Plaintiff's attorney regarding two

treating physicians and received nothing 'does not relieve the ALJ

of his duty to fully develop the record.'" (quoting Newsome v.

Astrue, 817 F. Supp. 2d 111, 137 (E.D.N.Y. 2011))); Outley v.

Astrue, No. 09-CV-141, 2010 WL 3703065, at *4 (N.D.N.Y. Aug. 26,

2010) (where counsel did not provide records as requested, ALJ had

duty to "obtain the necessary information himself").  That is

especially true where, as here, the records "are central to the

disability determination." Davis v. Colvin, No. 15-CV-479, 2016

WL 4708515, at *7-8 (W.D.N.Y. Sept. 9, 2016) ("Given the

significance of the missing records and the impact their absence

had on the ALJ's decision, the ALJ should have tried to obtain the

records on his own after not hearing from [the plaintiff's] counsel. By not doing so, the ALJ created a gap in the record that necessitates remand."); see also Corona, 2017 WL 1133341, at *16 ("Because Dr. Chaudry was the only treating psychiatrist to provide opinions as to Plaintiff's mental health limitations, and the ALJ identified missing records representing a year of monthly treatment, the ALJ cannot discredit his opinion based on lack of supporting evidence without first obtaining Dr. Chaudry's treatment notes to determine whether his conclusions are supported." (footnote omitted)).

To be sure, in two non-precedential opinions (one of which is not citable pursuant to Second Circuit Rule 31.1.1(b)(2)) the Court of Appeals indicated that it is not always necessary for the ALJ to pursue missing records on his own. See Frye ex rel. A.O. v Astrue, 485 F. App'x 484, 488 n.2 (2d Cir. 2012); Jordan v. Commissioner of Social Security, 142 F. App'x 542 (2d Cir. 2005). However, in those cases, there was significantly more activity connected with the provision of necessary evidence than there was here. In Frye, the Second Circuit recognized that the duty to develop the record was fulfilled where, after the ALJ followed up with the claimant's counsel, the attorney responded with a request for more time to submit additional evidence, which the ALJ granted. See Frye, 485 F. App'x at 488 n.2. And, indeed, in that case, the

claimant's counsel submitted the evidence, which the ALJ considered. See Frye ex rel. A.O. v. Commissioner of Social Security, No. 10-CV-98, 2010 WL 6426346, at *16 (N.D.N.Y. Nov. 12, 2010). In Jordan, after the ALJ contacted the claimant's attorney, the attorney responded that there was "nothing further to add" to the record. Jordan, 142 F. App'x at 543. Thus, in those cases, either (1) additional records were actually submitted or (2) the ALJ was assured that no more records were forthcoming. Cf. Mercado v. Colvin, No. 15 Civ. 2283, 2016 WL 3866587, at *16 n.42 (S.D.N.Y. July 13, 2016) (noting that, in general, where medical record is incomplete, "the ALJ should reach out to th[e] treating source for clarification and additional evidence" (quoting Villarreal v. Colvin, No. 13 Civ. 6253, 2015 WL 6759503, at *21 (S.D.N.Y. Nov. 5, 2015) (collecting cases))).

It is clear that the ALJ must make "every reasonable effort" to fully and fairly develop the record, taking into account the circumstances of the case. Devora v. Barnhart, 205 F. Supp. 2d 164, 175 (S.D.N.Y. 2002) (quoting Perez, 77 F.3d at 47); see also Outley, 2010 WL 3703065, at *4. Sometimes, this will require more than keeping the record open and following-up with counsel. For example, in Glast, "the ALJ asked counsel to 'see if there's anything out there we don't have' and left the record open for two weeks." 2013 WL 5532696, at *10. Counsel responded that no

records were available from one of the claimant's treating physicians, but provided no information about the other. <u>Id.</u> The district court held that the ALJ had not discharged his duty to develop the record, especially in light of the fact that the ALJ ultimately accorded the opinion of a non-treating physician significant weight. <u>Id.</u>

Here, the ALJ (1) recognized the lack of records from the plaintiff's treating sources (including his only treating psychiatrist and the primary health care provider treating his back pain), (2) relied in part on the absence of documents to devalue the opinions of those sources, (3) banked on counsel providing the records, and (4) failed to "reach out to th[e] treating source[s] for clarification and additional evidence," <u>Villarreal</u>, 2015 WL 6759503, at *21, when those records were not forthcoming. That was insufficient.[8] <u>See, e.g.</u>, <u>Davis</u>, 2016 WL

_____

[8] Because I recommend remanding for further development of the record, I cannot address the parties' arguments regarding whether the ALJ's decision was supported by substantial evidence. <u>See, e.g.</u>, <u>Moran</u>, 569 F.3d at 112 ("Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, "we must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act." (alterations in original) (quoting <u>Cruz</u>, 912 F.2d at 11)); <u>Corona</u>, 2017 WL 1133341 (noting that without fulfilling "threshold duty to develop the record" ALJ cannot "even begin to discharge his duties . . . under the treating physician rule" (alteration in original) (quoting <u>Pabon v. Barnhart</u>, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003))); <u>Estrada v. Commissioner of Social Security</u>, No. 13 Civ. 4278, 2014 WL 3819080, at *4 (S.D.N.Y. June 25, 2014) ("In the

4708515, at *8; cf. Petrovic v. Commissioner of Social Security,
No. 15 Civ. 2194, 2016 WL 6084069, at *10-11 (S.D.N.Y. Aug. 25,
2016) (ALJ fulfilled duty to develop record where he made four
requests for chiropractic records that were "not [] necessary to
determine plaintiff's disability under the regulations" but did
not seek unnecessary additional records from hospital or from
physician whose name the plaintiff did not provide); Martinez-
Paulino v. Astrue, No. 11 Civ. 5485, 2012 WL 3564140, at *14
(S.D.N.Y. Aug. 20, 2012) (duty to develop record discharged where
"Commissioner made seven attempts to obtain the records").

Conclusion

For these reasons, I recommend denying the Commissioner's
motion for judgment on the pleadings, granting the plaintiff's
motion for judgment on the pleadings, and remanding this case to
the Social Security Administration for further proceedings
pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and
6(d) of the Federal Rules of Civil Procedure, the parties shall
have fourteen (14) days from this date to file written objections
to this Report and Recommendation. Such objections shall be filed

---

absence of a complete record and a full and fair hearing, the Court
cannot determine whether the ALJ's conclusions are supported by
substantial evidence and thus must remand for further
development.")

with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Vernon S. Broderick, Room 415, 40 Foley Square, New York, New York 10007, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          May 11, 2017

Copies transmitted this date to:

Daniel Berger, Esq.
NY Disability, LLC
1000 Grand Concourse, Suite 1-A
Bronx, NY 10451

Leslie A. Ramirez-Fisher, Esq.
Assistant U.S. Attorney
86 Chambers St.
New York, NY 10007